SANITARY AND IMPROVEMENT DISTRICT NO. 95 OF DOUGLAS
COUNTY, NEBRASKA, A CORPORATION, APPELLANT, V. CITY OF
OMAHA, NEBRASKA, A MUNICIPAL CORPORATION, APPELLEE.
365 N.W.2d 398

Filed March 29, 1985.   No. 83-774.

Robert J. Huck of Croker, Huck & McReynolds, and Lyle E. Strom of Fitzgerald, Brown, Leahy, Strom, Schorr & Barmettler, for appellant.

Herbert M. Fitle, Omaha City Attorney, and Charles K. Bunger, for appellee.

KRIVOSHA, C.J., BOSLAUGH, HASTINGS, SHANAHAN, and GRANT, JJ.

KRIVOSHA, C.J.

Sanitary and Improvement District No. 95 (S.I.D. No. 95), which encompasses the Mockingbird Hills West Subdivision in Douglas County, Nebraska, appeals from a judgment entered by the district court for Douglas County, Nebraska, sustaining the action of the mayor of the city of Omaha in vetoing a certain resolution earlier adopted by the city council of the city of Omaha approving the construction of a recreational facility by S.I.D. No. 95.

At least part of the basis for the mayor's veto was set out in his message attached to the veto. That message, as quoted in the district court's order, reads in pertinent part:

> The area in question, in addition to other areas adjacent to our corporate limits, is ready for annexation both from the standpoint of the orderly growth of City and financial

criteria regarding debt. The Directors of both the Planning and Finance Department (sic) have advised me that these annexations should take place 1 January, 1981.

Since the proposed improvement is to be paid by obligation bonds, it is obvious that the annexation of this particular area will be postponed for a period of eight to ten years. This will not only interrupt the orderly growth of the City, but will cause the loss of revenue to the City in the form of sales and other taxes.

Further, there has [sic] been inquiries of the same nature made by other Sanitary Improvement Districts. It will be difficult to justify this request and not grant others. In the alternative, if the policy will be to grant such requests, the annexation program will be incomplete [sic] chaos.

The district court, in its judgment, further noted that in a newspaper article the mayor stated that the reason he decided to veto the council's approval of the facilities was "the fact that the City Council wants surrounding communities to study the I-80 interchange . . . ." The district court concluded that the mayor's power to veto legislation stems from § 2.16 of Omaha's home rule charter of 1956 and that the mayor, therefore, has unlimited authority to veto a resolution even though the authority of the city council in adopting the resolution in the first instance was limited by statute. Specifically, the district court found:

The Mayor may veto any ordinances proposed under Neb. Rev. Stat. §31-740 (1978) for any reason he considers appropriate, and is not required by the Home Rule Charter to base his veto on the fact that the proposed construction does not conform with the Master Plan or the construction specifications and standards established by the Municipality.

Because we believe that the district court was in error in this regard, we reverse and remand.

The record discloses what can best be described as sheer frustration by the residents of S.I.D. No. 95. Sometime prior to 1975, S.I.D. No. 95 determined that it would construct an outdoor swimming pool for its residents. The city of Omaha advised the district, however, that it would not approve any

more outdoor swimming pools and that if S.I.D. No. 95 wanted to build a pool, it would have to be enclosed. Because this type of structure was more costly, S.I.D. No. 95 elected to wait until it could afford the construction.

In 1978 the board of trustees of S.I.D. No. 95 consulted with its fiscal agent regarding the financial ability of the S.I.D. to construct an indoor swimming facility. The S.I.D. by that time was financially very responsible. Its assessed valuation had sufficiently increased, and its debt had sufficiently decreased. Such a facility could be constructed by the S.I.D. without having to significantly raise its mill levy. The board then consulted with Omaha's parks and recreation department, which informed S.I.D. No. 95 that the city would not approve an enclosed swimming pool but now wanted a regional community center built in the area, which not only would include an indoor swimming pool but should further contain meeting rooms, multipurpose rooms, arts and crafts rooms, and some type of financially self-sustaining handball courts. The proposal was submitted to the residents of the district, and more than 95 percent of those contacted approved the proposal.

Armed with the full support of the city's parks and recreation department and the approval of nearly all of the residents of the district, the S.I.D. No. 95 board, in August of 1979, presented a proposal to build this facility to the Omaha City Council. The financial data submitted to the city council indicated that the S.I.D. No. 95 tax levy would retire the amount of debt necessary to pay for such a community center over a 6-year period and that S.I.D. No. 95 was capable of making the payment at a reasonable mill levy if the city chose not to annex the district before the debt was paid. By a vote of 6 to 1 the city council approved the construction of the facility. The resolution was then submitted to the mayor, who vetoed the proposal and returned it to the city council, which failed to override the veto.

In August of 1980 S.I.D. No. 95 once again appeared before the city council of the city of Omaha seeking approval of a resolution which would authorize the construction of the recreational facility. At that meeting some of the council members indicated that they wanted to wait until after the

September S.I.D. No. 95 board elections before voting on this matter, since some opposition to the plan had apparently surfaced. The council president publicly announced that Mayor Veys had told him that if the council approved the resolution, the mayor would not veto it. S.I.D. No. 95 agreed to wait and come back after the September election. No comment was ever made by anyone during any of this time that the plan for the recreational facility did not conform to either the master plan, if indeed one existed, or to construction specifications and standards established by the city of Omaha.

In September of 1980 elections were held by S.I.D. No. 95. Five persons ran on a platform which favored immediate construction of the community center. Three of those were write-in candidates. Opposing them were three candidates on the ballot who ran on a "wait-and-see" attitude toward the community center. The five candidates who were totally in favor of the community center were elected. Armed with that encouragement, S.I.D. No. 95, on September 9, 1980, again appeared before the city council and requested approval of the construction plan. By a vote of 6 to 1 a resolution approving the construction of the community center was adopted by the Omaha City Council and sent to the mayor. On September 17, 1980, Mayor Veys vetoed the resolution, giving as his reasons those statements recited by the district court in its journal order. The city council failed to override the mayor's veto.

S.I.D. No. 95 maintains that the action of the district court in approving the veto entered by Mayor Veys was in error for one or more of the following reasons: (1) The mayor had no authority to veto the resolution for any reason, because Neb. Rev. Stat. § 31-740 (Reissue 1984) delegated the authority to either approve or disapprove a proposed recreational facility only to the "governing body" of the city of Omaha, which did not include the mayor; (2) If the mayor had authority to veto the resolution, he did not have unlimited authority, but could only veto the resolution if the proposed facility did not conform to either the master plan adopted by the city of Omaha or the construction specifications and standards established by the city of Omaha; (3) The veto by Mayor Veys was arbitrary, capricious, and unreasonable, and therefore invalid; and (4)

The city of Omaha does not have a master plan, and therefore its governing body acquired no jurisdiction in this matter.

We believe, for reasons which we will set out more fully hereinafter, that we need only discuss the question addressed by the district court, to wit, whether the authority of the mayor to veto such a resolution is unlimited or whether it is in some manner limited by the provisions of § 31-740. Because we believe that the authority to approve or disapprove a recreational facility is not unlimited but, in fact, is limited as provided by the specific language of § 31-740, we reverse the decision of the district court.

S.I.D. No. 95, like all other S.I.D.s, is a creature of statute, created pursuant to the provisions of Neb. Rev. Stat. §§ 31-727 to 31-762 (Reissue 1984). An S.I.D. is specifically described by statute as "a body corporate and politic," and has power and authority to take and hold real and personal property necessary for its use, to make contracts, to sue and be sued, to have and use a corporate seal, and to exercise any and all other corporate powers necessary to carry out the purposes of the act. See § 31-732. The method of forming an S.I.D. is described by statute. See § 31-727. An S.I.D. *may not* include land within a municipality. See § 31-730. See, also, *Sanitary & Improvement Dist. v. City of Ralston*, 182 Neb. 63, 152 N.W.2d 111 (1967). The provisions of the statutes regarding the creation, operation, and maintenance of S.I.D.s are internally complete, and it is clear that but for the language of § 31-740 the city of Omaha would have no authority to approve or disapprove the action sought to be taken by S.I.D. No. 95. If, then, the authority of the city of Omaha to affect the rights of S.I.D. No. 95 in any manner is conferred by statute, it seems clear beyond question that such authority cannot exceed that granted by statute.

The authority so delegated is clear and unambiguous. Section 31-740 grants to S.I.D.s the power and authority to construct various amenities necessary for residents living within the S.I.D.s, including recreational facilities. Section 31-740 then further provides:

> Prior to the installation of any of the improvements provided for in this section, the plans or contracts for such

improvements, *other than* for public parks, playgrounds, and recreational facilities, whether a district acts separately or jointly with other districts as permitted by section 31-727, shall be approved *by the public works department* of any municipality when such improvements or any part thereof are within the area of the zoning jurisdiction of such municipality; *Provided*, that if such improvements are without the area of the zoning jurisdiction of any municipality, plans for such improvements shall be approved by the county board of the county wherein such improvements are located, and plans and exact costs for *public parks, playgrounds, and recreational facilities shall* be approved by resolution of the *governing body* of such municipality or county after a public hearing held not less than five days after notice of the hearing has been published in a newspaper of general circulation in such municipality or county.

(Emphasis supplied.)

A reading of the statute makes it clear that what the Legislature intended was a procedure whereby it could be determined in advance that facilities which may ultimately be made a part of a city are compatible with the facilities in place or contemplated to be constructed by the city which may annex the S.I.D. *Except* for public parks, playgrounds, and recreational facilities, the governing body has *no* authority to approve or disapprove the proposal or to adopt a resolution which must then, under the Omaha city charter, be forwarded to the mayor. If what was involved here was a sewer facility, a street facility, or a water main, the approval would be by the public works department only and not by either the city council or the mayor, or whatever group of officials constitutes the "governing body." Only with regard to public parks, playgrounds, and recreational facilities does the "governing body" obtain the right to approve or disapprove by resolution. Section 31-740 goes on further, however, to provide:

Such approval [of public parks, playgrounds, and recreational facilities] shall relate to conformity with the master plan and the construction specifications and standards theretofore established by such municipality or

county; *Provided*, when no master plan and construction specifications and standards have been established such approval shall not be required.

It is difficult to conceive how the authority of at least the city council could be any more specific and limited. If the city of Omaha has not developed a master plan and construction specifications and standards, the decision whether to build a recreational facility would be left solely to the discretion of the S.I.D. It therefore seems clear beyond question that when the statute provides that "[s]uch approval *shall* relate to conformity with the master plan and the construction specifications and standards theretofore established by such municipality or county" (emphasis supplied), the Legislature has delegated to the "governing body," whomever it may be, limited authority. That limited authority was to determine whether the recreational facilities were contrary to the master plan or construction specifications and standards developed by the city which might ultimately one day annex the S.I.D. and thereby acquire a recreational facility not in conformance with either the city's master plan or its construction specifications and standards.

The city agrees with the district court that at least so far as the city council was concerned, its authority to approve or disapprove was limited. They both agree that the city council could not refuse to approve the resolution if indeed the proposal conformed with the master plan and the construction specifications and standards. In that regard they are both correct. See *Reid v. City of Omaha*, 150 Neb. 286, 34 N.W.2d 375 (1948). The dispute, however, appears to arise by reason of the language of § 2.16 of the charter of the city of Omaha, which provides in pertinent part:

The Mayor, within seven days of receipt of an ordinance or resolution, shall return it to the City Clerk with or without his approval, or with his veto. If an ordinance or resolution is vetoed, the Mayor shall attach a written statement explaining the reasons for his veto. Ordinances or resolutions vetoed by the Mayor shall be considered at the next regular meeting of the Council, and the Council may pass the ordinance over the veto by the affirmative

vote of five of its members. . . . The Mayor's veto power shall extend to . . . any ordinance or resolution, except appropriations for auditing or investigating any part of the executive branch.

The city argues that while the city council may be limited in adopting the resolution, the mayor, by reason of the home rule charter, is vested with unlimited authority to veto. On its face, such an argument seems to make little sense. It is difficult to imagine why the Legislature would grant to the city council limited authority regarding recreational facilities and grant to the mayor unlimited authority to veto. While there may be some question as to whether in fact the mayor is a part of the "governing body," we need not resolve that issue. It seems clear to us that if the mayor is a part of that governing body, he has no greater authority with regard to exercising his veto power over a recreational facility to be constructed by an S.I.D. than the city council has in adopting or disapproving the resolution.

The city seems to argue that this is a matter of local concern and therefore the charter of the city of Omaha must take precedence over the state statutes, at least insofar as the mayor's authority is concerned. Initially, we find no such distinction made in § 31-740. Moreover, we do not believe that this is a matter of "local concern." This is not at all a matter involving the action of a municipality within its boundaries but is, rather, a matter involving a governmental body entirely outside the boundaries of a municipality. In *Axberg v. City of Lincoln*, 141 Neb. 55, 58, 2 N.W.2d 613, 614-15 (1942), we observed:

The purpose of the home rule charter provision of the Constitution was to render the cities adopting such charter provisions as nearly independent of state legislation as was possible. Under it a city may provide for the exercise of every power connected with the proper and efficient government of the municipality *where the legislature has not entered the field*. Where the legislature has enacted a law affecting municipal affairs, but which is also of state concern, the law takes precedence over any municipal action taken under the home rule charter. But where the legislative act deals with a *strictly local municipal concern*, it can have no application to a city which has adopted a

> home rule charter. Whether or not an act of the legislature pertains to a matter of local or state-wide concern becomes a question for the courts when a conflict of authority arises.

(Emphasis supplied.)

One need only examine cases previously decided by this court to quickly conclude that the authority delegated to the city of Omaha by the provisions of § 31-740 is clearly of statewide concern and that the home rule charter of the city of Omaha is limited by the provisions of § 31-740 to whatever extent they may be in conflict. See, *Hall v. Cox Cable of Omaha, Inc.*, 212 Neb. 887, 327 N.W.2d 595 (1982); *Midwest Employers Council, Inc. v. City of Omaha*, 177 Neb. 877, 131 N.W.2d 609 (1964); *Omaha Parking Authority v. City of Omaha*, 163 Neb. 97, 77 N.W.2d 862 (1956); *Michelson v. City of Grand Island*, 154 Neb. 654, 48 N.W.2d 769 (1951); *Carlberg v. Metcalfe*, 120 Neb. 481, 234 N.W. 87 (1930).

Generally, it can be said that matters are of local concern only when they do not extend beyond the limits of the municipality. See, *Nagle v. City of Grand Island*, 144 Neb. 67, 12 N.W.2d 540 (1943); *Pester v. City of Lincoln*, 127 Neb. 440, 255 N.W. 923 (1934); *Salsbury v. City of Lincoln*, 117 Neb. 465, 220 N.W. 827 (1928). And even then they may be of statewide concern, as already noted. See *Jacobberger v. Terry*, 211 Neb. 878, 320 N.W.2d 903 (1982). Where, as here, the action by the city affects land wholly outside the boundaries of the city, it is difficult to conceive how it can be argued that this is not a matter of statewide concern, but only of local interest. Just as the mayor of the city of Omaha is limited in his authority to veto resolutions adopted by the city council, as more particularly set out in § 2.16 of the Omaha city charter, so too is his authority limited by the provisions of § 31-740 in the case of S.I.D.s. The statutory requirements must be complied with in exercising the veto power. Under the provisions of § 31-740 the authority of the city council, in the first instance, and the mayor thereafter to approve or disapprove proposals for the construction of a recreational facility to be built by a sanitary and improvement district is limited to a determination of whether or not the proposals conform to the municipality's master plan and

construction specifications and standards.

The city cites to us the case of *Green's Bar Incorporated v. Johnson*, 275 Minn. 471, 147 N.W.2d 686 (1967), in support of its position that the mayor has unlimited authority to veto any resolution adopted by the city council. The Minnesota decision, however, does not stand for that proposition and is readily distinguishable. The Minnesota statute, Minn. Stat. Ann. § 340.11 Subd. 4 (West 1957), which delegated to the governing bodies the authority to approve or disapprove the issuance of all "on-sale" liquor licenses had no limiting provision such as § 31-740. The Supreme Court of Minnesota, in upholding the action of the mayor in vetoing the resolution, said at 473, 147 N.W.2d at 688:

> The statute does not undertake to specify the manner in which the authority so delegated is to be exercised. We attribute to the legislature an intent that the governmental authority delegated by the statute be exercised by the various municipalities in the way specified by the documents giving rise to their existence.

The facts simply are not the same. The authority delegated to the "governing body," if indeed it included the mayor, unlike the Minnesota statute, was limited under the provisions of § 31-740.

Where, as here, no question was ever raised that the proposal submitted by S.I.D. No. 95 did not conform to whatever limited master plan the city of Omaha had regarding parks and recreational facilities or that the proposal did not comply with the construction specifications and standards, the action of the mayor in vetoing the resolution adopted by the city council for reasons other than noncompliance with the master plan or construction specifications and standards was beyond the authority delegated to the "governing body" by § 31-740, and cannot stand. The mayor did not have unlimited authority under the facts in this case to veto the resolution.

The mayor's concern that the construction of the facility would inhibit annexation is not relevant to this issue. The city may, if it chooses, annex the area and assume the obligation or delay annexing the area and be free of any obligations. The fact that S.I.D. No. 95 has obligations is merely a factor which the

city must take into account in deciding whether to annex the area. The construction of the facility and the debt which goes with it does not preclude the city from annexing the area, and is not within the limitations prescribed by § 31-740. Should the Legislature wish to take that matter into account, it may amend the statutes to do so. It may very well be that it would have been far less expensive for the city of Omaha to permit S.I.D. No. 95 to build its simple outdoor swimming pool more than 10 years ago, when it would now be paid for. Having failed to permit that to happen, and having delayed construction by insisting on the enlarged facility, the city is not now in a position to deny its construction simply because it does not want to assume the obligation at some future time.

The decision of the district court is therefore reversed and the cause remanded with directions to find that the action of the mayor in vetoing the resolution adopted by the city council approving the construction of the recreational facility was beyond his authority and therefore invalid, and to order and direct the approval of such construction forthwith.

REVERSED AND REMANDED WITH DIRECTIONS.

WHITE and CAPORALE, JJ., not participating.